Minute Order Form (06/97)

JS.6

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | James F. Holderman | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 98 C 601 | **DATE** | 4/12/2000 |
| **CASE TITLE** | MADONIA vs. MAVO LEASING INC et al | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]  Pursuant to Memorandum Opinion and Order entered this day, defendants' motion for summary judgment is granted. This action is dismissed in its entirety.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | | Document Number |
| | No notices required. | number of notices | |
| ✓ | Notices mailed by judge's staff. | | |
| | Notified counsel by telephone. | APR 1 3 2000 | 42 |
| | Docketing to mail notices. | date docketed | |
| | Mail AO 450 form. | docketing deputy initials | |
| | Copy to judge/magistrate judge. | 4/12/2000 | |
| JS ✗ | courtroom deputy's initials | date mailed notice | |
| | | JS | |
| | Date/time received in central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION



|  |  |  |
|---|---|---|
| MICHAEL MADONIA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | 98 C 601 |
| v. | ) | No. 97 C 8216 |
| | ) | |
| MAVO LEASING, INC. and | ) | |
| DOMINICKS FINER FOODS, INC., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

JAMES F. HOLDERMAN, District Judge:

Plaintiff Michael Madonia filed suit against defendants Mavo Leasing Company ("Mavo")

and Dominick's Finer Foods, Inc. ("Dominicks") alleging discrimination in violation of the

Americans with Disabilities Act ("ADA"), 42. U.S.C. § 12101 et seq. (Count I), and a state law

claim for the intentional infliction of emotional distress (Count II). Defendants have moved for

summary judgment pursuant to Federal Rule of Civil Procedure 56. For the following reasons,

defendants' motion for summary judgment is GRANTED.

### STATEMENT OF FACTS[1]

Plaintiff Michael Madonia was employed by defendant Mavo Leasing Company

---

[1] The following statement of facts comes from the parties' Local Rule 56.1(a) 56.1(b)
statements of material facts and accompanying exhibits.

1



("Mavo"), a company which, until November, 1998, leased truck drivers to defendant Dominick's Finer Foods, Inc. ("Dominicks"). Though Mavo was plaintiff's direct employer, plaintiff was leased to Dominicks' truck terminal as a truck driver and was supervised by Dominicks. Mavo's truck drivers were represented by Local 703 of the International Brotherhood of Teamsters ("the union"). Dominicks' Director of Transportation or Director of Fleet at the relevant times was Arthur Messer. Michael Leitner managed day-to-day operations of the distribution center and was effectively Messer's supervisor. Plaintiff occasionally reported to Messer, but their contacts were informal and infrequent. Plaintiff had no direct reporting relationship to Leitner. Mavo's president was Michael Mavigliano and its general manager was Gerald Serpico.

1.    Count I:  Americans With Disabilities Act Discrimination

Plaintiff's arm and back were injured on November 25, 1996 by a malfunctioning power jack at one of Dominicks' stores. For several days before the injury, Plaintiff had complained to his doctor, Dominicks' management, and the emergency room at Loyola University Medical Center, that he was inhaling antifreeze fumes at work, and that the fumes were making him sick.

Plaintiff believed that Dominicks was disregarding his complaints, and so he called the Environmental Protection Agency ("EPA") on the day of his arm and back injuries to complain about the fumes. While on hold with the EPA, Plaintiff was interrupted by the appearance of Larry Schumaker, a co-worker, on the line. Plaintiff was apparently enraged by the interruption. Several minutes later, plaintiff confronted Schumaker on the loading dock, and told him that he had been on an important call and that if he [Schumaker] ever "fucked with me or fucked with the telephone while I was using it, I would pound his fucking face into the concrete." Plaintiff later attributed this outburst to the fact that he had been injured and was sick from the antifreeze fumes.

2

Plaintiff then prepared to drive back to the Dominicks' warehouse, but was stopped by the store's manager, William Peters. Plaintiff told Peters about the power jack injury, that he had been exposed to toxic fumes, and was going to see a doctor. Peters told plaintiff to calm down and go to the break room. On his way there, plaintiff began to cry. Peters then conveyed the information regarding plaintiff's outburst with Schumaker to Dominicks' garage manager, C.B. Zangara. Zangara told Peters to call the police. Schumaker signed a formal complaint against plaintiff, and plaintiff was arrested for assault.

On November 26, 1996, plaintiff was terminated due to his actions of November 26, 1996. Plaintiff filed a grievance under the union contract. A grievance hearing was held at Mavo's offices between the company and union agents. During that meeting, plaintiff expressed concern about antifreeze leaking into his truck's exhaust system. While participating in that meeting, plaintiff again began to cry, and his union representatives left the room to speak with plaintiff privately. When they returned, the union representatives told the Mavo participants that plaintiff's "personal problems" required medical attention. Plaintiff maintains that the only "personal problems" identified at the meeting were problems caused by his exposure to antifreeze leaks in his truck. At the suggestion of one of the union representatives, it was agreed that plaintiff would be sent to Dr. Richard Ready, Mavo's medical review officer, for an independent medical evaluation to determine whether plaintiff could be returned to work. If Dr. Ready determined that plaintiff could work, Mavo agreed to reinstate him. Dr. Ready testified that he believed the primary reason plaintiff was sent to him was to determine if plaintiff had a substance abuse problem, and Mavo did not direct Dr. Ready to test plaintiff for antifreeze exposure.

On December 3, 1996, Dr. Ready examined plaintiff and determined that, among other

3

things, plaintiff was preoccupied with the belief that he had been or was being poisoned by antifreeze and that his employer was seeking to harm him. For those reasons and others, Dr. Ready concluded that plaintiff was depressed and possibly paranoid and referred plaintiff to a psychiatrist, Steven Cochran. Dr. Cochran diagnosed plaintiff as suffering from major depression and depression-related paranoia and recommended that plaintiff begin taking Zoloft, an antidepressant. Plaintiff was given samples of the drug. Both doctors agreed that plaintiff should not drive a truck unless he continued receiving treatment for his psychiatric problems.

On December 10, 1996, Dr. Ready drafted a letter to Mavigliano, Mavo's president, informing him that he had examined plaintiff on December 3, 1996, and had referred plaintiff to Dr. Cochran for a psychiatric evaluation because he believed he might be suffering from depression. Dr. Ready explained as follows:

> I spoke with Dr. Cochran and he concurs with the diagnosis of depression and personality disorder and recommends that Mike go on anti-depressants as well as follow up with him for individual psychotherapy later this week and the following week. Both Dr. Cochran and I feel that Mike cannot continue to use the same motor vehicle, whether the problem with his vehicle is actual or psychological, continuation of using it is not in the best interests of either party.
>
> . . .
>
> I have also asked Mike to come back and see me in four weeks. Based on the above I feel that Mike can return to work at any time. I feel that continuation of his employment be [sic] contingent on following through with his psychotherapy with Dr. Cochran and me.

Mavo never informed Dr. Ready or Dr. Cochran that plaintiff's truck was subsequently found to be leaking antifreeze.

Based upon Dr. Ready's December 10, 1996 letter, Mavo reinstated plaintiff to his duties provided he complied with whatever treatment his treating physicians recommended. A Settlement Agreement signed on December 23, 1996, resolving plaintiff's grievance provides in part that if plaintiff "fails to complete the program currently assigned by Dr. Ready and Dr. Cochran, or if he assaults or batters anyone while on duty, he may be discharged immediately." The "program" was never specifically detailed, beyond what is set out in the December 10 letter -- that plaintiff take antidepressants, follow up with Dr. Cochran and Dr. Ready in the coming weeks, and "follow through" with his psychotherapy. Mavo and Dominicks management were not aware of the specifics of what would be required for Plaintiff's therapy "program."

After the Settlement Agreement was signed in December, plaintiff continued off work until January 4, 1997, due to disability caused by the injuries he sustained to his arm and back on November 25, 1996. When Plaintiff returned to work, he drove trucks full time for Dominicks until August 25, 1997, when he was discharged for a second time. During that eight-month period, neither Mavo nor Dominicks monitored plaintiff's medical treatment.

Regulations issued by the Department of Transportation ("DOT") provide that a person shall not drive a commercial motor vehicle if he or she has a "mental, nervous, organic, or functional disease or psychiatric disorder likely to interfere with his/her ability to drive a commercial motor vehicle safely." 49 C.F.R. § 391.41(a), (b)(9). The Regulations also require commercial motor vehicle drivers to be medically examined and certified every two years in order to drive a commercial motor vehicle. 49 C.F.R. § 391.45(b)(1). Doctors who perform the exam must be familiar with the physical and mental demands associated with driving a commercial motor vehicle. Part of the exam is to "detect the presence to physical, mental, or organic defects of such a character

and extent as to affect the applicant's ability to operate a commercial motor vehicle safely." 49 C.F.R. § 391.47. Plaintiff passed a DOT examination on July 28, 1997. Mavo received a copy of plaintiff's medical examination results on July 31, 1997. Mavo did not challenge the validity of the medical examination results.

After his reinstatement, plaintiff's lack of self control recurred. Messer, one of plaintiff's immediate supervisors, testified that plaintiff was often abrasive and once walked up to Messer and stated, without reason or provocation, "You know, you fucking assholes. You just want to fuck with me. Why do you fuck with me all the time?" Co-worker Joel Soltes complained to Messer that when he attempted to prevent plaintiff from removing a box and some speakers from plaintiff's former truck, plaintiff became extremely angry and referred to several Dominicks' managers as "assholes" and "sons of bitches." After that event, plaintiff, plaintiff's union agent, and Messer met to discuss it. Plaintiff denied having challenged Soltes to a fight. Messer referred to plaintiff as "Jekyll and Hyde" and told plaintiff that plaintiff, not the truck, was the problem. Plaintiff received no negative performance reviews concerning these outbursts, and no disciplinary action was taken.

Incidents with plaintiff's erratic behavior continued. On June 28 or July 1, 1997, plaintiff told Leitner that he would call the police when Leitner, exasperated by plaintiff's delay in choosing a truck, told plaintiff to go to work. Plaintiff also angrily threw out another driver's belongings from a truck that he was sharing with that driver. Those occurrences and rumors that plaintiff had discontinued taking his antidepressants because they interfered with his sex life led Leitner to tell Messer to contact Mavo and find out whether plaintiff was seeing his doctors as directed and agreed in the Settlement Agreement. Shortly thereafter, Messer called Serpico and asked him if plaintiff was following his medical regimen. Serpico contacted Dr. Ready in either July or August and may

or may not have asked him to contact Dr. Cochran.

There is some conflicting evidence as to when Mavo first contacted the doctors to determine whether plaintiff was still being treated. Dr. Cochran testified that he spoke with either Dr. Ready or Mavigliano before July 7, 1997 regarding the fact that plaintiff was no longer seeing him. Dr. Ready claims that he did not speak to Dr. Cochran until August, and Mavigliano claims that he never spoke to Dr. Cochran.

On July 7, 1997, Dr. Cochran wrote and dated a letter to Mavigliano. Dr. Cochran did not mail the letter until August 6, 1997, but gave no reason for the delay. The letter stated, in part:

> This letter is to inform you that Mr. Madonia has not been following through with the treatments that he agreed to previously. He was last seen on 6/1/97 [sic] and has no upcoming appointments scheduled. On 5/7/97 [sic], he informed me that he stopped the anitdepresent medication that I placed him on earlier. . . . He continues to have difficulties from a psychiatric perspective with a continuing presence of suspicious and paranoid feelings involving his employment and events that have occurred there. . . . At this time, he does not want to have psychiatric treatment or take mediation for his difficulties. . . .

Dr. Cochran testified that he wrote the letter at the request of either Mavigliano or Dr. Ready and that defendants knew that plaintiff was no longer seeing him prior to July 7, 1997, but neither Mavigliano nor Dr. Ready remember speaking to Dr. Cochran prior to his writing the letter. Dr. Cochran did not provide a copy of the letter to Dr. Ready or inform plaintiff that he was sending the letter to Mavo. Serpico received a copy of Dr. Cochran's letter on August 8, 1997.

On the same day the Dr. Cochran dated the letter to Mavo, he also wrote a letter to plaintiff which stated, in full:

> The following letter is to inform you that I have decided that based on your lack of
> compliance with my recommendations for mediation as well as appointments, I am
> terminating you as a patient under my care. As you are not taking medication at this
> time, there should be no problem in terms of that aspect of your previous treatment.
> If you have any psychiatric needs during the next 30 days please feel free to contact
> Salt Creek Therapy Center and assistance will be provided for you.

Dr. Cochran never told plaintiff that if he quit coming for treatment, he would loose his job.

On August 7, 1997 plaintiff filed a job injury report for exposure to exhaust fumes and was taken by Tom Perth of Dominicks and Robert Poole of the union to Westlake Hospital. Dominicks attempted to perform a drug test on plaintiff while he was at Westlake, but Poore, as a union representative, informed Perth that the company did not have probable cause to perform a drug test under the terms of the collective bargaining agreement between the company and Local 703.

Following the receipt of Dr. Cochran's letter in early August, Serpico called Dr. Ready to ask about the status of plaintiff's treatment. Dr. Ready replied by letter dated and faxed to Mavo on August 19, 1997, which states: "Mike has failed to follow-up with me and I understand from Dr. Cochran that he has not followed up with him for psychotherapy." Dr. Ready did not know that this letter was informing Mavo that plaintiff was breaching the terms of the Settlement Agreement or that plaintiff's failure to follow up with Cochran would be grounds for his termination. Plaintiff's failure to follow up his treatment refers to appointments that he missed in January, 1997. Those appointments were not specifically set out in the December 10, 1996 letter outlining plaintiff's course of treatment.

On August 19, 1997, managers from both Mavo (Serpico, Mavigliano) and Dominicks (Messer, Leitner, Zangara) met in Leitner's office to review the situation, particularly Dr. Ready and Dr. Cochran's respective letters concerning plaintiff's condition and failure to follow the

recommended treatment. All present agreed that, because plaintiff evidently failed to comply with the terms of the Settlement Agreement, particularly the medical treatment condition, he should be discharged. The principal descionmakers each testified that plaintiff's non-compliance with the 1996 Settlement Agreement was the sole reason for his discharge and the only reason Messer ever gave plaintiff for the decision was his failure to comply with the treatment program. Plaintiff was discharged on August 25, 1997.

Following the second termination, Mavo held various meetings with plaintiff and his union representative to discuss the circumstances leading to his discharge. Plaintiff filed a grievance concerning the termination which was ultimately arbitrated. Throughout the formal and informal grievance process, plaintiff asserted that he was in full compliance with the medical regimen specified by his treating physicians, but he prevented Mavo and the union from obtaining key medical information that would substantiate his claim. Only on October 17, 1997, did plaintiff provide Mavo with a limited release for the medical information. That release resulted in a meeting on November 13, 1997 between Dr. Ready and representatives from the union and Mavo. At that meeting, Dr. Ready reiterated that plaintiff had not completed the medical treatment program he and Dr. Cochran had prescribed. Dr. Ready repeated his conclusion that, as of May 1997, plaintiff was not qualified to drive a commercial motor vehicle without treatment. Prior to that meeting, Dr. Ready had not informed Mavo or the Department of Transportation that plaintiff was unable to drive a truck. Also at the meeting, plaintiff rebuffed Dr. Ready's suggestion that plaintiff see another psychiatrist if he was dissatisfied with Dr. Cochran. Plaintiff testified at his deposition that he had told Dr. Ready on September 8, 1997 that he was seeing another doctor and requested that Dr. Ready forward his records to that doctor.

Plaintiff was not reinstated following the second discharge because Mavo and Dominicks remained convinced that plaintiff was not complying with the medical condition set forth in his Settlement Agreement of December, 1996. An arbitrator heard plaintiff's second grievance and found that he had been terminated with for cause.

At some point during the events described above, Messer contacted Serpico in order to confirm that plaintiff was following through with the program. During that conversation, Messer referred to plaintiff as "goofy." Messer testified that he was referring to plaintiff's behavior problems, including his insubordinate behavior and general abrasiveness, and denied concern over plaintiff's mental state. Messer also told Joel Soltes, a Dominicks' mechanic, that he thought plaintiff was "a little crazy."

II.    Count II: Intentional Infliction of Emotional Distress

Plaintiff's complaint states a cause of action for defendants' withholding information from him, Dr. Ready, and Dr. Cochran about the mechanical condition of the truck plaintiff drove prior to his first termination, T-150, in a deliberate attempt to exacerbate his already precarious emotional condition. Mark Goddard, the general foreman of Dominicks' garage, supervised 21 mechanics and 800 pieces of equipment. His supervisors were Messer and Zangara.

On June 21, 1996, an oil analysis performed on T-150 revealed that there was a "[s]evere level of coolant (glycol)" in the oil. Beginning in 1995, white smoke emanated from the exhaust of T-150, which indicates coolant leaking into the exhaust. As described more fully bellow, between 1995 and early 1997, the cylinder head of T-150 was removed four times to correct coolant leaks.

On October 14, 1996, before plaintiff's complaints of November, 1996, T-150 was "winterized," a process which included pressure testing the cooling system to search for coolant

10

leaks. No leaks were discovered. However, on November 21, 1996, plaintiff complained that T-150 was leaking antifreeze. Goddard took T-150 out of service that day and personally pressurized the cooling system to check for leaks. No leaks were discovered at that time, either. Goddard then instructed Joel Soltes, Dominicks' second shift garage foreman, to continue checking the T-150 for coolant leaks, which Soltes did by heating up the engine and pressurizing the cooling system overnight. Soltes reported that he, too, found no leaks. Nevertheless, Soltes marked the reservoir tank on T-150 with the intention of leaving it to sit in the garage over the weekend to see if a leak could be detected. Despite the fact that T-150 was intended to be out of service for testing, plaintiff removed it and drove it on November 24 and 25 of 1996 without authorization.

On November 26, 1996, the day after his first termination, plaintiff complained to Jim Edgar, an agent of the Occupational Safety and Health Administration ("OSHA") that T-150 had an antifreeze and carbon monoxide leak. Later that day, an OSHA official telephoned Messer to inform him that a complaint and request to investigate had been made about T-150. That request was formalized in a letter from OSHA to Messer dated November 26, 1996. A similar request was made three days later by plaintiff's union. On November 26, 1996, in response to the OSHA inquiry, Messer sent T-150 to Northwest Ford Truck Center to perform an independent test for coolant leaks. Northwest Ford informed Messer the next day that it could find no visible leaks.

Messer then asked Goddard to specifically test the air quality within T-150's cab to determine whether there were problems. On December 3, 1996, Goddard and Cores, another mechanic, tested the T-150's exhaust levels both in the cab and at the exhaust pipe and found both to be within normal levels. Neither Goddard nor Cores were qualified by the state of Illinois to test truck emissions. Corres performed the test by placing the testing probe on the back of the front seat of the cab, not

11

inside the exhaust stack.  After placing the test probe in the cab, Cores printed a test report and handed it to Goddard.  No one from Dominicks asked Corres for his opinion regarding the results, nor did they show him the test results.

On December 4, 1996, in response to OSHA's November 26, 1996 letter, Dominick's legal department transmitted Northwest Ford's December 2, 1996 opinion letter and the results of Goddard's emissions testing to OSHA.  Dominicks' response represented that Cores was a State Certified Emissions Tester and that the results were "well within the acceptable emissions levels established by the Illinois Environmental Protection Agency."  Messer also later testified that the emissions test had been performed by two certified emissions testers.  In fact, Cores is state certified to test cars, but not trucks, and none of the emissions test printouts produced by Dominicks indicate passing test results.  On December 6, 1996, OSHA forwarded those documents to plaintiff along with a letter stating that Dominicks' response was adequate and that it would take no further action. Dissatisfied with the investigation, plaintiff met in person with OSHA agent Edgar sometime in early December and explained to Edgar why he believed the testing to be inadequate.  Edgar told plaintiff that he would look into the matter further and subsequently informed him that Dominicks planned to have further testing done by another independent company.

On January 3, 1997, Boelter Environmental Consultants ("Boelter") tested the air quality in T-150's cab.  On January 6, 1997, Boelter issued a report to Dominicks stating that "exhaust gas was not entering the tractor cab at levels high enough to be a health concern."  Plaintiff was given a copy of the Boelter test results in approximately April 1997.  After Boelter tested T-150's air quality, Messer told Goddard to continue checking the T-150 to ensure that there was nothing wrong, which Goddard did beginning in January, 1997.  T-150's cylinder head was removed and sent off-site to

a machine shop, Crankshaft Technologies, where it was subjected to a special chemical process known as "magnafluxing" used to check parts for cracks. Although Crankshaft was unable to detect any defect, it replaced the injector cone anyway because it did not like the way it looked. After the cylinder head was removed, Soltes reinstalled it, pressure-tested the cooling system, and found that the head was leaking from the recently-replaced injector cone. Soltes then removed the head a second time, and Gonnard sent it back to Crankshaft. Crankshaft subsequently informed Goddard that the injector cone it had installed in the head was defective because the tooling used to replace it was worn out. After a delay of several weeks, which Gonnard attributed to Crankshaft's inability to acquire immediate replacement tooling, Crankshaft returned T-150's cylinder head. T-150's cylinder head was again reinstalled and its cooling system pressurized. No leaks were initially discovered. Goddard then instructed Soltes to idle the truck for a couple of hours before putting it back in service to ensure that there were no problems. Soltes did so, inspected T-150 again, and discovered that it was leaking coolant. Plaintiff was not informed of the discovery of the leak. T-150's cylinder head was removed a third time, sent back to Crankshaft and magnafluxed again. This time, Crankshaft discovered a small crack in the cylinder head. Plaintiff was not informed of the discovery of the crack. On March 28, 1997, a new cylinder head was purchased and installed in T-150. Cracks of the type ultimately discovered in T-150's cylinder had are difficult to detect because they do not leak consistently and can be detected only with special diagnostic tools which Dominicks did not have.

During plaintiff's deposition, he admitted that the only material information withheld from him regarding T-150 throughout this entire period was Dominick's admission that it had discovered an antifreeze leak in March of 1997. Plaintiff attributes his emotional condition to his ongoing effort

13

to force Dominicks to admit that T-150 did have an antifreeze leak. Plaintiff was not assigned to drive T-150 after his reinstatement. Mavo was not involved with the physical operation of Dominicks' trucks. Dominicks did not inform either Mavigliano or Serpico that T-150, in fact, had an antifreeze leak or that its cylinder head had been replaced until long after plaintiff had been terminated the second time in August, 1997.

## STANDARD OF REVIEW

Under Rule 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In ruling on a motion for summary judgment, the evidence of the nonmovant must be believed and all justifiable inferences must be drawn in the nonmovant's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S. Ct. 2505, 2513 (1996). This court's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.

A party who bears the burden of proof on a particular issue, however, may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial. Celotex Corp. v. Catrett, 477 U.S. 317, 324 106 S. Ct. 2548, 2553 (1986). There is no issue for trial "unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Anderson, 477 U.S. at 249, 106 S. Ct. at 2511.

## ANALYSIS

As an initial matter, this court must address which of the parties' stated facts the court did and did not consider in ruling on this motion. In accordance with Local Rule 56.1(a)(3), defendants

14

filed a timely statement of undisputed material facts. Plaintiff was required to file a concise response to each of defendants' factual statements supported by, in the case of disagreement, specific references to supporting materials relied upon. Local Rule 56.1(b)(3)(A). In addition, plaintiff was entitled to file a separate statement of additional undisputed facts that require the denial of summary judgment, consisting of short numbered paragraphs. Plaintiff's response to defendant's 56.1(a) statement of undisputed facts contained some unsupported denials and partial denials. The response also contained numerous additional facts intended to qualify plaintiff's admissions and denials. Some of those additional facts were supported with citations to the record; others were not. Those additional facts were not properly set forth in a separate statement of facts, as required by the rules. Defendants did not respond to the additional facts set forth in plaintiff's 56.1(b)(3)(A) denials.

It is within this court's discretion whether to strictly enforce or to overlook transgressions of the Local Rules. See Dade v. Sherwin-Williams Co., 128 F.3d 1135, 1138 (7th Cir. 1997) (finding no abuse of discretion in trial court's refusal to consider additional facts submitted by plaintiff not properly filed in a Rule 12(n) (now 56.1(b)) statement of additional facts). Under the Local Rules, any denials not supported with citations to the record are deemed admitted. Local Rule 56.1(b)(3)(B). Accordingly, this court considered as true those facts set forth in defendants' 56.1(a) statement which were not specifically denied with supporting evidence. However, this court overlooked plaintiff's transgression of failing to set forth additional facts in the proper form. Accordingly, this court did consider the additional facts set forth in plaintiff's response which were supported by citation to the record, even though the response did not conform to the Local Rules, which forbid commingling of responses with additional statements of fact. See Mayer v. Kemper Ins., Inc, 1999 WL 75484, No. 98 C 8124, at *1 (N.D. Ill. Sept. 1, 1999). Even considering

plaintiff's improperly submitted additional facts, this court finds that summary judgment is appropriate in favor of defendants.

I.    Prima Facie Case of Discrimination Under the ADA

Plaintiff's complaint alleges that he was discriminated against on the basis of his perceived disability of a mental impairment in violation of the ADA. The ADA prohibits employers from discriminating against qualified individuals with a disability because of the disability of such individual with respect to job application, hiring, advancement, discharge, and other terms, conditions, and privileges of employment. 42 U.S.C. § 12112(a). In order to make out a prima facie case under the ADA, plaintiff must show that: (1) he was or is disabled, and (2) he was otherwise qualified for his job. Id. If plaintiff succeeds in showing that he is protected by the ADA, he must then present evidence that he was discriminated against on the basis of his disability. Because plaintiff has presented no direct evidence of discrimination, he must proceed under the burden shifting approach of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S.Ct. 1817 (1973). Under the burden-shifting method, plaintiff must demonstrate, inter alia, that he was performing his job to the employer's legitimate expectations. See Leffel v. Valley Fin. Services, 113 F.3d 787, 792 (7th Cir. 1997). If the plaintiff succeeds in meeting his initial burden, the burden shift to defendants to come forward with evidence of a legitimate and non-discriminatory reason for the employment decision. See Sattar, 138 F.3d at 1169. The plaintiff must then prove, by a preponderance of the evidence, that the reasons proffered by the defendant were pretextual for intentional discrimination. See St. Mary's Honor Center v. Hicks, 509 U.S. 502, 507-08, 113 S.Ct. 2742 (1993).

A.    Disability Under the ADA

Defendants argue that plaintiff cannot succeed in establishing a prima facie case under the

ADA because he was neither disabled nor regarded as such by his employers. To invoke protection under the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 et seq., plaintiff must show that he suffers from a disability as defined in the Act. See Weiler v. Household Fin. Corp., 101 F.3d 519, 523 (7th Cir. 1996). The Act defines "disability" in three ways: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual; (B) a record of such impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2). Equal Employment Opportunity Commission regulations interpreting the Act define "[m]ajor [l]ife [a]ctivities" to include "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i). "Substantially limits" means that the person is either "[u]nable to perform a major life activity" or is "significantly restricted as to the condition, manner or duration" under which the individual can perform the major life activity as compared to the average person in the general population. Id. at § 1630.2(j)(1).

If plaintiff's condition does not rise to the level of a disability, or if his employers did not regard him as having such a disability, then he cannot recover under the Act even if defendants terminated him on account of the impairment. "The Act is not a general protection of medically afflicted persons. . . . . [I]f the employer discriminates against them on account of their being (or being believed by him to be) ill, even permanently ill, but not disabled, there is no violation." Christian v. St. Anthony Med. Ctr., Inc., 117 F.3d 1051, 1053 (7th Cir. 1997). Defendants argue that plaintiff is not protected under the ADA because his mental impairment was not substantially limiting and they did not regard him as having a substantially limiting impairment. In support, defendants cite the fact that they reinstated plaintiff following his November 26, 1996 discharge,

strong evidence that they did not regard him as suffering from a substantially limiting impairment. See <u>Sanchez v. Henderson</u>, 188 F.3d 740, 744 (7th Cir. 1999). Defendants' argument misses the mark. A plaintiff's disability under the ADA is considered at the time of the employment decision in question. See <u>Nowak v. St. Rita High Sch.</u>, 142 F.3d 999, 1002 (7th Cir. 1998). Here, that employment decision was plaintiff's second termination in August of 1997. Plaintiff has presented sufficient evidence that defendants regarded him as being disabled at the time of the adverse employment action to survive summary judgment on this issue. Defendants argue that they did not consider plaintiff to be disabled <u>when treated</u>, but it is undisputed that defendants did not believe that plaintiff was being properly treated at the time of his second discharge. In fact, it was precisely because defendants believed that plaintiff had ceased his treatment that they choose to terminate his employment. As such, there is a genuine issue as to whether defendants regarded plaintiff as having a substantially limiting impairment in August, 1997.

B.    <u>Otherwise Qualified</u>

Defendants also argue that plaintiff is not protected by the ADA because he is not "otherwise qualified" to drive commercial vehicles, due to his mental impairment. 42 U.S.C. § 12112(a). The ADA defines a "qualified individual with a disability" as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). In support of their argument that plaintiff was not qualified to drive a commercial vehicle, defendants cite the Regulations issued by the Department of Transportation ("DOT"), which provide that a person shall not drive a commercial motor vehicle if he or she has a "mental, nervous, organic, or functional disease or psychiatric disorder likely to interfere with his/her ability to drive a commercial motor vehicle

18

safely." 49 C.F.R. § 391.41(a), (b)(9). Here, the undisputed facts show that two doctors diagnosed plaintiff as suffering from depression and possibly paranoia and concluded that he should not drive a truck unless he received ongoing medical treatment for his mental condition, including psychotherapy and medication. It is also undisputed that plaintiff stopped his treatment with the two doctors before he was discharged.

However, plaintiff has presented sufficient evidence that he was qualified to drive a commercial vehicle at the time of his termination to overcome a motion for summary judgment on this basis. The DOT Regulations cited by defendant also require commercial motor vehicle drivers to be medically examined and certified every two years in order to drive a commercial motor vehicle. 49 C.F.R. § 391.45(b)(1). Part of the exam is to "detect the presence to physical, mental, or organic defects of such a character and extent as to affect the applicant's ability to operate a commercial motor vehicle safely." 49 C.F.R. § 391.47. Plaintiff passed a DOT examination on July 28, 1997. Mavo received a copy of plaintiff's medical examination results on July 31, 1997. Mavo did not challenge the validity of the medical examination results. Defendant argues that the DOT examination did not test plaintiff's mental condition, but only his physical condition. However, under the regulations, the exam is intended to detect mental defects. In light of the fact that no such defect was noted and defendants did not object to the results, plaintiff has created a genuine dispute that he did not have a mental defect that would interfere with his ability to drive a commercial vehicle, and was thus "otherwise qualified" to perform the essential functions of his job.

C. Meeting Employer's Legitimate Exceptions

Defendants next argue that plaintiff cannot make out a prima facie case of discrimination because he cannot prove that he was meeting his employers' legitimate expectations. According to

defendants, their legitimate expectations upon reinstating plaintiff in December, 1996, were spelled out in the Settlement Agreement: if plaintiff "fails to complete the program currently assigned by Dr. Ready and Dr. Cochran, or if he assaults or batters anyone while on duty, he may be discharged immediately." According to defendants, this legitimate expectation included that plaintiff would follow whatever treatment his doctors prescribed to ensure against the reoccurrence of the misconduct which led to his first discharge -- threatening outbursts. Because plaintiff failed to complete the treatment program, defendants argue, it is undisputed that plaintiff did not meet that legitimate exception. Plaintiff counters that defendants' expectations of the program were unclear. Plaintiff argues that because the program mandated by the Settlement Agreement was procured in bad faith and by fraud, and was ambiguous, there is a genuine issue of material fact as to whether he was meeting his employers' expectations.

This court finds it doubtful that there is a genuine dispute on this issue. First, plaintiff's argument that the Settlement Agreement was the product of fraud and reached in bad faith is without merit. It is undisputed that plaintiff had union representation in negotiating the terms of the Settlement Agreement, and plaintiff has pointed to no facts which suggest that plaintiff did not sign the agreement knowingly and voluntarily.

Furthermore, the Settlement Agreement was not ambiguous. While the Settlement Agreement did not spell out the terms of the program plaintiff was required to complete, the December 10, 1996 letter makes clear that plaintiff was required to "follow through" with the treatment prescribed by Dr. Ready and Dr. Cochran. It is undisputed that plaintiff terminated his treatment with the doctors, and ceased taking the medication which they had recommended, and thus did not "follow through" with the program. This court declines to decide that there is no genuine

dispute on this issue of material fact, however. Regardless of whether plaintiff was actually abiding by the his employer's legitimate expectations, it is undisputed that defendants honestly believed that he was not. As such, plaintiff has failed to show that defendants' proffered reasons for plaintiff's termination was pretextual, and this court grants summary judgment to defendants on that basis. See Jordan v. Summers, 205 F.3d 337 (7th Cir. 2000); Abioye v. Sundstrand Corp., 164 F.3d 364, 368 (7th Cir. 1998) (permitting district courts to avoid deciding whether plaintiff has met prima facie case, if defendant proffers nondiscriminatory reason and there is no showing of pretext).

II.    Pretext

Defendants argue that, even if plaintiff could succeed in establishing a prima facie case of discrimination, his ADA claim nonetheless fails because he cannot prove that defendants' stated nondiscriminatory reason for terminating him -- his breach of the 1996 Settlement Agreement -- was a pretext for discrimination. Plaintiff counters that he has, in fact, fulfilled the terms of the Settlement Agreement and that defendants' conduct leading to his termination is indicative of discriminatory animus.

Plaintiff argues that the full extent of the "program" which he was required to complete as a condition to maintaining his job is the December 10, 1996 letter, which provided that plaintiff was to "follow up with [Dr. Cochran] for individual psychotherapy later this week and the following week" and to "come back and see [Dr. Ready] in four weeks." Thus, plaintiff argues, there is a genuine issue of material fact as to whether he has, in fact, completed the program. Plaintiff argues that there was no express requirement in the Settlement Agreement that plaintiff continue treatment indefinitely. Plaintiff's argument ignores the second paragraph of the letter, however. As noted above, that paragraph provided that plaintiff's continued employment was contingent upon

21

"following through" with his psychotherapy with Dr. Cochran and Dr. Ready. Defendants agreed to reinstate plaintiff only on the condition that Dr. Ready found plaintiff to be able to work. The Settlement Agreement providing for that reinstatement required plaintiff to <u>complete</u> the program assigned by Dr. Ready in order to be considered able to work. The Settlement Agreement and the second paragraph of Dr. Ready's December 10, 1996 letter make clear that plaintiff's continued employment was contingent upon completing whatever psychotherapy the doctors deemed necessary for plaintiff to perform his job adequately.

Regardless of whether plaintiff did complete the program, there is no genuine dispute of material fact as to whether defendants received sufficient information to entitle them to honestly believe that plaintiff did not complete the program assigned and had thus breached the Settlement Agreement. It is undisputed that the reoccurrence of plaintiff's abrasive and erratic behavior prompted defendants to inquire into the state of plaintiff's treatment. On August 6, 1997, Mavigliano at Mavo received a letter from Dr. Cochran informing him that plaintiff "has not been following through with the treatment he agreed to previously," that he had ceased coming to appointments, and that he had stopped taking the antidepressants he had been placed upon. Dr. Ready's August 19 letter stated: "Mike has failed to follow-up with me and I understand from Dr. Cochran that he has not followed up with him for psychotherapy." The language of these two letters track the language of the Settlement Agreement almost precisely. The only two people in a position to know the status of plaintiff's treatment program informed defendants that plaintiff had not completed the treatment he <u>had agreed to</u> previously. Dr. Ready reiterated this conclusion after plaintiff's termination, stating his opinion that plaintiff was not qualified to drive a commercial vehicle without treatment.

22

Dr. Cochran informed plaintiff of the status of his treatment in similar language to that conveyed to defendants: "based upon your lack of compliance with my recommendations for medication as well as appointments, I am terminating you as a patient in my care." Plaintiff never contested Dr. Cochran's conclusion that plaintiff had failed to comply with Dr. Cochran's recommendations. Nor did plaintiff take advantage of repeated opportunities to seek further psychotherapy or a second opinion regarding his mental condition.

Plaintiff points to the following evidence that the breach of the Settlement Agreement was not the true reason for plaintiff's termination. First, plaintiff's supervisors and doctors had no consistent understanding of what the "program" consisted of or who had responsibility to monitor it. Plaintiff also notes that defendants did not monitor plaintiff's medical treatment during the eight-month period between his reinstatement and his second termination. Finally, plaintiff points to the fact that Dr. Ready and Dr. Cochran were unaware that plaintiff would be terminated for the failure to complete the treatment program.

The facts cited by plaintiff are simply not relevant to the issue of whether defendants honestly believed that plaintiff had breached the terms of the Settlement Agreement. The plain language of the Settlement Agreement stated that plaintiff could be terminated automatically if he failed to complete the program prescribed by his doctors. Under the plain language of the Settlement Agreement, the specifics of the program were to be determined by plaintiff's doctors. There was no need for defendants to be aware of the specifics of plaintiff's treatment program. The doctors informed defendants that plaintiff had discontinued his treatment, including use of his medication, and defendants were justified in relying on that information. See Rice v. Genova Prods., Inc., 978 F. Supp. 813, 821 (N.D. Ind. 1997). Especially in light of the reoccurrence of plaintiff's outbursts

and abrasive behavior, defendants had ample reason to believe that plaintiff had breached the terms of the Settlement Agreement without knowing the specifics of the program. The doctors' understanding of the terms of the Settlement Agreement is likewise irrelevant. The doctors were not the decisionmakers; they merely informed defendants of the factual basis which entitled defendants to terminate plaintiff's employment. The doctors' understanding of the effect their letters is irrelevant to whether defendants honestly and in good faith believed that plaintiff had breached the Settlement Agreement by not completing the treatment program he agreed to undergo.

Plaintiff also complains that he received no notification of the need to continue his treatment until he was terminated. Yet, again, the plain language of the Settlement Agreement stated that plaintiff could be terminated <u>automatically</u> for the failure to complete the doctors' program. It is undisputed that defendants were told and honestly believed that plaintiff had not completed that program. There was thus no necessity that defendants provide plaintiff with warning that he was to be terminated. The Settlement Agreement itself provided notice to plaintiff that failure to complete the program would result in automatic termination. Furthermore, Dr. Cochran <u>did</u> provide notice to plaintiff that his treatment program had been formally terminated due to plaintiff's failure to complete the program. No further notice by defendants was required.

Furthermore, plaintiff's complaints as to the adequacy of defendants' understanding and investigation of his treatment program are not probative to a showing that defendants' stated reason for plaintiff's termination is a lie. Plaintiff has presented no evidence that defendants did not honestly believe that plaintiff had breached the terms of the Settlement Agreement, and "a reason honestly described but poorly founded is not a pretext as that term is used in the law of discrimination." <u>Pollard v. Rea Magnet Wire Co., Inc.</u>, 824 F.2d 557, 559 (7th Cir. 1987). Arguing

24

about the accuracy of the employers' assessment is a distraction, see Brill v. Lante Corp., 119 F.3d 1266, 1273 (7th Cir. 1997), because the question is not whether the employers' reasons for a decision are "right but whether the employer's description of its reasons is honest." Gustovich v. AT & T Communications, Inc., 972 F.2d 845, 848 (7th Cir. 1992).

The only evidence plaintiff presents to dispute defendants' stated reason for his termination is in the form of an attack the adequacy of defendants' monitoring of his program and the handling of the investigation which led to his termination. In effect, plaintiff argues that defendants' stated reason for his termination is poorly founded. This is not enough to survive summary judgment. See Kariotis v. Navistar Intern. Transp. Corp., 131 F.3d 672, 677 (7th Cir. 1997) ("In the end, we are left with Kariotis' theory that the company's investigation was so impulsive and shoddy that it reeks of discriminatory intent--a theory that we rejected in Pollard on the ground that a federal court is not a court of industrial relations, and one which we again reject today. . . . The same principle dooms each of Kariotis' discrimination claims under the ADA, ADEA and ERISA."). Plaintiff has failed to offer any comparative evidence to suggest that defendants treated those employees whom they did not regard as having a disability more favorably. See id. Nor did plaintiff offer this court any evidence suggesting that animus to disabled persons was the true motivation for the decision to terminate his employment. Kier v. Commercial Union Ins. Cos., 808 F.2d 1254, 1259 (7th Cir. 1987) ("An employer can fire an employee for any reason, fair or unfair, so long as the decision to terminate is not based on age or some other protected category").

Messer's statements referring to plaintiff as "goofy" and "a little crazy" are not sufficient to raise a genuine dispute of defendants' animus to people with mental disabilities. In light of the undisputed evidence of plaintiff's behavior, which was undeniably odd, and Messer's testimony that

the comments referred to that behavior, these comments are not sufficient to create a genuine dispute that animus to plaintiff's mental condition was the true reason for his termination. This is especially so in light of the fact that plaintiff was not terminated for his behavior or defendants' interpretation of it, but because he breached the plain language of the Settlement Agreement. Plaintiff does not dispute that plaintiff's breach of the Settlement Agreement was the only reason ever discussed by Dominicks or Mavo management for plaintiff's termination.

Because plaintiff has failed to present sufficient evidence to support a finding that defendants' stated reason for his second termination -- the breach of the Settlement Agreement -- was pretextual, plaintiff's ADA claim must fail. Summary judgment is thus granted to defendants on the Count I, the ADA claim.

III.     Intentional Infliction of Emotional Distress

Count II of plaintiff's complaint states a claim for intentional infliction of emotional distress. Plaintiff's claim is predicated upon allegations that defendants intentionally withheld information about the antifreeze leak that was ultimately discovered in his truck from him and from his doctors. According to plaintiff, defendants' withholding of that information resulted in prolonging his battle to force defendants to admit the truth, exacerbating his precarious emotional condition. Defendant argues that plaintiff's claim fails as a matter of law because he cannot prove extreme and outrageous conduct. In response, plaintiff cites an extensive list of acts by defendants. In addition to failing to inform him and his doctors about the leaks, plaintiff lists the following allegedly harassing acts: sending him to Dr. Ready for a drug test after plaintiff's arrest and complaints of antifreeze exposure, not instructing Dr. Ready to test plaintiff for exposure to antifreeze fumes, falsely representing to OSHA that T-150 was tested by a State Certified Emissions Tester and that the test results indicated

26

passing results, Messer's statement that the antifreeze problem was with plaintiff and not with the truck, terminating plaintiff's employment without first asking plaintiff whether he was continuing treatment, attempting to test plaintiff for drugs two weeks prior to his termination, and terminating plaintiff's employment for being mentally ill despite the fact that he had recently passed a DOT medical examination.

To survive a motion for summary judgment on a claim for intentional infliction of emotional distress under Illinois law, a plaintiff must created a genuine issue of material fact that: 1) the defendant's conduct was extreme and outrageous; 2) the defendant either intended that his conduct inflict severe emotional distress, or knew that there was a high probability that his conduct would cause severe emotional distress; and 3) the defendant's conduct in fact caused severe emotional distress. See Doe v. Calumet City, 161 Ill. 2d 374, 391, 641 N.E.2d 498, 506 (1994). "Liability [for intentionally inflicting emotional distress] has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency . . ." Public Fin. Corp. v. Davis, 66 Ill. 2d 85, 360 N.E.2d 765, 767 (1976) (quoting Restatement (Second) of Torts § 46 cmt. d (1965)). Moreover, "[t]he law intervenes only where the distress inflicted is so severe that no reasonable man could be expected to endure it. The intensity and the duration of the distress are factors to be considered in determining its severity." Id. (quoting Restatement (Second) of Torts § 46 cmt. j (1965)). Whether the alleged conduct was extreme and outrageous is judged by an objective standard. Schroeder v. Lufthansa German Airlines, 875 F.2d 613, 623 (7th Cir. 1989).

Two of the acts plaintiff complains of can not, as a matter of law, be considered "extreme and outrageous conduct." As to the circumstances of plaintiff's termination, whether plaintiff was

undergoing some treatment or whether he was actually mentally ill are irrelevant to defendants' power to terminate his employment without warning. Under the Settlement Agreement, plaintiff was required to complete treatment with Dr. Ready and Dr. Cochran. It is undisputed that plaintiff did not complete that treatment, and thus defendant's failure to determine whether plaintiff was undergoing some other therapy is irrelevant. It is likewise irrelevant that plaintiff had recently passed a DOT examination because the stated reason for plaintiff's termination (which plaintiff has not discredited) was plaintiff's breach of the Settlement Agreement, not his mental condition.

Viewing the evidence in the light most favorable to plaintiff, the rest of the acts complained of also fail to rise to the level of conduct necessary to state a claim for intentional infliction of emotional distress in Illinois. In regard to defendant's failure to tell plaintiff that a leak had been discovered in his truck, plaintiff's only complaint is that because defendants withheld the information, plaintiff could not vindicate his belief that the truck did have a leak at the time he had driven it. It is undisputed that plaintiff no longer drove the truck at the time the leak was discovered. As such, the only purpose that could have been served by informing plaintiff of the leak was to vindicate plaintiff's contention that the truck had, in fact, leaked antifreeze. Defendants never allowed plaintiff to drive a truck which they knew to be leaking antifreeze, and it is undisputed that defendants went to great lengths to determine if there were any leaks, and to fix any problems which arose. It is also undisputed that leaks of the type ultimately found in plaintiff's truck are difficult to detect and that neither Mavo nor Dominicks had capacity to detect it. Moreover, while there is evidence that there was, in fact, a leak in plaintiff's truck, there is no evidence that the leak did or could have caused physical injury to plaintiff. In fact, the uncontested evidence shows just the opposite: that the leak did not pose a threat to human health. The Boelter report, for example, found

that "exhaust gas was not entering the tractor cab at levels high enough to be a health concern." Depriving a person of the opportunity to know that he "was right all along" cannot be understood to rise to the level of extreme and outrageous conduct. Far more egregious conduct has failed to survive a motion to dismiss in this district. See Briggs v. North Shore Sanitary Dist., 914 F. Supp. 245, 252 (N.D. Ill. 1996) (allegations that the plaintiff's employer and fellow employees hung a pickaninny doll in her office, subjected her to racial slurs, excluded her from office social activities, placed her on probation and refused to train her properly did not rise to the level of extreme and outrageous conduct while allegations that co-workers exposed her to toxic fumes for more than eight hours did).

In so ruling, this court does not ignore the fact that defendants were aware of plaintiff's unusual sensitivity to information about antifreeze leaks. A defendant's awareness that a plaintiff is susceptible to emotional distress is certainly a factor in determining whether conduct is extreme and outrageous. McGrath v. Fahey,122 Ill. 2d 78, 533 N.E.2d 806, 811. However, defendants' knowledge of the plaintiff's susceptibility does not alter the objective standard by which this court judges whether conduct is outrageous. A reasonable person may consider behavior, which he or she might otherwise consider merely rude, abrasive or inconsiderate, to be extreme and outrageous if the actor knows that the victim is particularly likely to suffer emotional distress as a result of the conduct. McGrath, 126 Ill.2d at 393, 533 N.E.2d at 811. Thus, where, as here, a defendant knows that a plaintiff is susceptible to emotional distress, the court must determine whether an average member of the community would consider the defendant's conduct extreme and outrageous under all of the circumstances of the case, including the defendant's knowledge of the plaintiff's susceptibility. See Van Stan v. Fancy Colours & Co., 125 F.3d 563, 568 (7th Cir. 1997). Under

this standard, even considering defendants' knowledge of plaintiff's unusual sensitivity to antifreeze leaks, defendants' conduct, even if inappropriate, does not rise to the level of outrageousness necessary for recovery. See Id.

The same is true for defendant's failure to inform the doctors of the antifreeze leaks eventually discovered in plaintiff's truck. Plaintiff has presented no evidence that the doctors conclusions were based on the assumption that plaintiff's truck was not actually leaking, nor that plaintiff's diagnosis or recommended treatment would have changed had the doctors become aware that plaintiff's truck had, in fact, leaked antifreeze. To the contrary, Dr. Ready recommended plaintiff's changing trucks, whether the antifreeze problem was real or psychological. As such, defendants' failure to inform the doctors of the leak, once it was discovered, could not reasonably be considered outrageous conduct.

Finally, plaintiff's remaining claims also cannot form the basis of a claim for intentional infliction of emotional distress. Messer's comment that plaintiff's problems had more to do with plaintiff than with plaintiff's truck is supported by the evidence and certainly not beyond the realm of human decency. Defendants' decision not to request Dr. Ready to test plaintiff for exposure to antifreeze fumes was reasonable because the purpose of Dr. Ready's exam was to determine whether plaintiff was mentally fit to continue working, in light of his violent outburst and arrest. Defendants' unsuccessful attempts to have plaintiff undergo a drug test and Dominicks' apparent misrepresentation to OSHA are troubling. However, plaintiff has produced no evidence that either the attempted drug tests or the misrepresentation resulted in harm or threatened harm. In the absence of such evidence, the conduct cannot be reasonably be said to exceed all possible bounds of decency. See Van Stan v. Fancy Colours & Co., 125 F.3d 563, 568 (7th Cir. 1997) ("While we do not mean

to condone such conduct, we do not believe that this course of conduct . . . exceeded all possible bounds of decency.").

## CONCLUSION

For the reasons stated, defendants' motion for summary judgement is GRANTED. This case is dismissed in its entirety.

ENTER:

*James F. Holderman*

JAMES F. HOLDERMAN
United States District Judge

DATE: April 12, 2000

# United States District Court
## Northern District of Illinois
### Eastern Division

MADONIA

v.

MAVO LEASING INC et al

**JUDGMENT IN A CIVIL CASE**

Case Number: 98 C 601

☐      Jury Verdict. This action came before the Court for a trial by jury. The issues have been tried and the jury rendered its verdict.

■      Decision by Court. This action came to trial or hearing before the Court. The issues have been tried or heard and a decision has been rendered.

IT IS HEREBY ORDERED AND ADJUDGED that summary judgment is entered in favor of defendants Mavo Leasing Inc. et al and against plaintiff Madonia. This action is dismissed in its entirety.

Michael W. Dobbins, Clerk of Court

Date: 4/12/2000

J. Smith, Deputy Clerk